BREAUX, C. J.
Plaintiff instituted this suit to recover the sum of $6,000 for damages for personal injuries.
He was defendant’s employs, and while at work for defendant he was severely hurt.
The judge of the district court allowed him $2,000 as damages.
Defendant appeals.
The work of plaintiff consisted in directing the loading of poles, pulling them from the stream and placing them on a platform, or ramp.
These poles were floated to the banks of the stream just in front of the ramp. After they had been pulled to the platform, or ramp, they were rolled over to skids connecting the car near by with the ramp. They would slide down the skids to the railroad cars. The cars were placed near the ramp on a spur track of the defendant, and from it these cars, after being loaded, were pulled to the main track.
An engine and boiler, as well as a wire cable, were used in pulling the trees out of the water onto the ramp. There were six or seven poles on the ramp. The plaintiff had charge of this work temporarily, and had a few hands under him. They were all under a permanent foreman, who had charge of this and other work for the defendant.
Plaintiff’s complaint is that in the performance of his work he stepped on one of the boards or planks of the flooring of the platform, or ramp, which gave way with him and caused him to fall a distance of about 15 feet, breaking his left leg in several places, and inflicting other injuries which permanently disabled him; that he was at the Oharity Hospital for about two months; that the plank on which he stepped was unsound and dangerous, but that he did not see the defect, and believed that it was solid and safe.
We are informed by the evidence that this plank was about 2 inches in thickness, about 10 inches wide, and about 8 feet in length.
Defendant’s contention is that plaintiff voluntarily and without necessity attempted to cross over poles or piles from one side of the ramp to the other, although these poles were wet and slippery, and that while thus attempting to cross he slipped and fell upon the float ear standing on the spur track, which was near the ramp on the west; that he was not acting under the orders of a superior, and that he took unnecessary risks In crossing over the poles. Defendant denied that it was the owner of the ramp, and averred that it did not have charge of the repairs of the ramp, was not responsible for its condition, and that it was using it only temporarily.
The defendant introduced in evidence a statement of the plaintiff, obtained by its claim agent three days after plaintiff had been admitted to the Charity Hospital and while he was suffering from the effects of *1099 the fall. We will hereafter refer to this statement, as it was introduced for the purpose of impeaching plaintiff.

*1097

*1099 The foreman of defendant, Turner, who had charge of the work and who was the superior of plaintiff, testified that plaintiff’s work required him occasionally to go on the ramp.
“Tes, sir,” he said, in answer to a question propounded, “his duties called him on top of the ramp.” And in answer to another question he said: “Yes, sir,” speaking of the poles, “he had to he there to measure them; that is, on the ramp.”
There is other testimony in the record tending to prove that his standing on the ramp was the only way to properly supervise the work and comply with the instructions he had received from the foreman.
It is in place to state that it was plaintiff’s first day’s work at loading poles. He had worked for defendant since a number of years as blacksmith and engineer, but this was his first day’s experience at this special work, to which he had been assigned.
Another of defendant’s employés, a telegraph operator and station agent, testified that the ramp was not what it should have been; that it was dilapidated and unsafe, as he well knew, for he' was on this ramp every day; that some of the planks of the platform, or ramp, were sound, and others were not sound on the lower side.
An attorney for plaintiff, in testifying about planks, said that the top lasts longer than the lower part, as the sun does not reach the lower part, and the latter are exposed to dampness, causing decay.
Plaintiff, while testifying in his own behalf, substantially said that he was walking on the poles near the ramp, and that he slipped and stepped on a plank below, which gave way. At another time he mentioned that he stepped on the plank, that it gave way, and in consequence he fell to the ground.
This asserted weak plank was on the outside of the ramp, near to the' ear on the western extremity of the platform, or ramp.
Witnesses after the accident examined the place and found a broken plank at the place of the accident, to some extent corroborating the testimony of the plaintiff.
We will here state that the platform, or ramp, is about 25 feet high from the ground. The spur track is on a trestle. The top of the poles, as heaped up, was about 3 feet from the plank on the side or western edge of the ramp; that is, the side nearest to the car. It was 8 or 9 feet from the plank to the flat car, and about 7 feet from the top of the flat car to the ground. The length of the ramp is about 75 feet. It extends some distance over the water. The length Of the poles was about 45 feet.
It was a part of plaintiff’s work to measure these poles while they were on the ramp, and he could not very well measure them without standing on the ramp.
The facts have given rise to issues not easy to decide. The testimony is conflicting,, and some of the statements inaccurate.
To begin with the discussion, we take.up for consideration the condition of the ramp and poles piled up on its upper platform and ready to be rolled over into the car.
If we are to believe the testimony of uncontradicted witnesses, the flooring of the ramp was not sound, and the ramp itself was out of repair and unsafe.
A similar accident was met with on this ramp, not as severe, by another person, a few days before the plaintiff fell.
Defendant avers that the ramp was not a part of its property, that its use by it was only temporary, and that it had nothing to do with the repairs — or, rather, may it not be, want of repairs?
*1101 Mr. White, a lumberman, it is said, was the owner of the ramp.
No one had a good word to say in behalf of the ramp, as relates to the condition it was in.
We imagine that we can say in its behalf that it was a picturesque old structure on the banks of the stream, extending from the bank some distance over the water.
It suffices, in so far as relates to defendant’s liability, that the place to which the plaintiff had been sent to work was unsafe, whether it was owned by defendant or not.
It has so often been decided that the master should furnish a safe place for his workman that it does not admit of any discussion, nor does it require that authority be cited in support of the proposition, generally accepted as true. If the place was unsafe, as the weight of the evidence shows it was, then the cause falls within the generally accepted rule whereby the master is held liable unless it appears that the party injured was negligent.
The first objection of defendant in support of its plea of contributory negligence of plaintiff is that he should not have attempted to cross over the heaped-up piles of poles in the chute made to haul them into and on the upper platform of the ramp. They were wet and slippery from the slippery mud on them. There was danger of slipping. It was none the less the duty of the plaintiff to step over them. These poles were long. They had to be measured. Those on the inside of the pile could best be inspected and measured by getting on the pile. It was necessary, it appears, at times, to stand on this pile; at other times, to pass from one side to the other, without stepping around. Stepping to the end of the poles, and around them, seems not to have been expected.
The foreman was emphatic in his statement upon the subject, and stated positively that it was necessary to walk across these poles. It was an incident of plaintiff’s occupation.
The testimony of the workmen, Therman and Brent, who were under plaintiff’s order, is the mainstay of the defendant.
The first named testified that he saw plaintiff step on the last pole of the ramp, slip, and fall to the ground. He did not notice a plank break.
„ In the written statement, which he handed over to his employer at the time, he stated that plaintiff fell as he stepped to the edge of the platform; that plaintiff was walking on the piling, his foot slipped, and he fell to the car; but in his testimony he asserts that plaintiff was standing on the pile when he fell, and not immediately on the platform. (A slight inconsistency which does not amount to very much.) We will refer to this phase of the case later.
This witness was fireman of the boiler and was standing at the north end of the platform.
Plaintiff fell about midway on the left side of the ramp. It is hardly possible that this witness could see the plaintiff standing on the roof of the ramp; he being immediately in front, near the boiler. He is not clear in his statement whether he saw plaintiff at the time or not. It is sufficient to state that he does not seem to have observed closely.
The other workman, Brent, owns that he was excited. He was standing on the flat ear below the top of the ramp, and yet he states he could see the top of the ramp, and could see the plaintiff standing on the piles on the top of the ramp, at the moment of the fall.
The attorney for plaintiff, to whom we have before referred, measured the place that the car on which this witness (Brent) was standing stood 52 inches from the after the accident, and stated as a witness ground, and that the distance from the top *1103 of the ramp to the track on which the car was standing is 18 feet. Deducting the 52 inches, the distance from the rail to the top of the car on which the witness was standing, there remained a distance of 8 feet 4 inches.
It was extraordinary if he could see the top of the ramp.
The attorney for plaintiff also testified that the poles on the ramp are stopped by pieces which project from the floor, and the poles were about 4 feet from the brink of the platform on- the left.
It does not satisfactorily appear how the witnesses Brent and Therman saw plaintiff slip, fall, and roll over 3 or 4 feet to the brink of the roof, and then fall to the ground, and this without falling on the flat car on which he stood. Instead of falling on the car itself, he fell on the side of the car.
In weighing and sifting the testimony, it creates the impression that these witnesses were in a flurry.
These ebony colored witnesses, Brent and Therman, were moved by commendable feeling toward the one under whose charge they were. They sought to give an account as well as they could.
In an emergency few men recall instances just as they occur. On the other hand, the fall must have impressed itself upon the plaintiff. His account, corroborated, appears as correct as possible under the circumstances. •
It is stated on the part of the defendant that the testimony does not establish with any certainty that there was a board on the platform at the place where plaintiff fell, if he fell as he testified.
The witness Miller was at the ramp a short time after the accident, and saw a broken plank at the place where plaintiff fell. The attorney before mentioned saw pieces of this board. The preponderance of the testimony sustained the plaintiff’s averment in this respect.
But it is urged on the part of defendant that plaintiff was a vice principal, and as such it devolved upon him to inspect the place and assure himself that there was no danger for himself or the two men under him.
Conceding that it was Incumbent upon him to give himself some concern about his own safety and that of his men, he had naught to do with the laying of boards on the platform in use of the company. This was no part of his work. It was not connected with his employment. He was sent to the place to haul up poles, and not to inspect the ramp to which he was to haul them.
1-Ie had been at work at this place only a day.
The employer increased the risk of the employé by failing to provide a safe place to stand or rest on. By multiplying the chances of accident, the defendant increased its liability.
It is in the next place urged on behalf of defendant that plaintiff has concluded himself by his own statement, reduced to writing and handed over to the claim agent of the defendant company, from all right of recovering anything.
This statement canot be held as conclusive. The plaintiff testified that he was given to understand by the claim agent of the defendant, who called to see him while he was seriously ill and greatly suffering at the Charity Hospital, that he (plaintiff) would receive something from defendant to relieve him from the loss incurred by the fall. The plaintiff said that he desired to retain his place as workman; that he was given to understand that he would be retained on the pay roll as one of defendant’s employes while he was ill (no one as a witness contradicted plaintiff, not even the agent); and that after he had sufficiently recovered he *1105 ■called upon the agent, who informed him that the promise could not be fulfilled.
It seems from the testimony that he (the .agent of the defendant company) had kept the word of promise to his ear and broken it to his hope.
At this point another phase of the case ■suggests itself, which has not been pressed upon our attention. It is referred to, to the extent that it is pertinent, in matter of the written statement of plaintiff touching the incidents of the fall.
To set forth this point, it is noted that .plaintiff avers that, in accordance with the instructions given him by the foreman; Turner, he was compelled to go upon the ramp in order to faithfully discharge his duty. It was from the heap of poles that he stepped to the plank which broke, as he stated.
The defendant sought to meet this averment by the contention that the act of plaintiff in “going upon the wet, muddy, and slippery piling was voluntary, and that he was not acting under orders of a superior,” as he alleged.
As to this averment of defendant, just quoted, it has already been stated that Foreman Turner said that plaintiff was acting in accordance with the duties incumbent upon him in going on and stepping across the heap of poles on the ramp.
Plaintiff, in his declaration written while he was at the hospital, said;
“While walking on the pile next to the car, I slipped and stepped on a plank below, which gave way and threw me on my thigh across the edge of the car, breaking my thigh.”
Plaintiff testified that he made the statement while suffering.
True, this declaration is not entirely consistent with his testimony, for he testified that he walked across the poles, stepped down on a plank (meaning a plank on the floor of the wharf) next to the edge of the railroad chute, and the plank broke under his weight.
We have seen that the contention on the part of plaintiff is that there was a space of about three feet between the piling and the walk. It is in this space (where the plank was) that he fell.
We conclude that from any point of view, whether plaintiff fell from the top of the ramp, as set forth in defendant’s contention, or whether he directly stepped, without having slipped at all, on the plank, does not seem to alter the situation very much. There is some testimony tending to prove that it was a continuing fall, beginning with the slip which plaintiff made while on the ramp a moment before he fell.
In any case the weak plank comes in for a share of the blame. Assuming the theory to be correct, based on plaintiff’s written statement while out of court, that the point of departure was from the slip while on the poles, if, to recover from the slip, plaintiff stepped on the board, and the board was unsafe, still the defendant would be liable.
We will, from this point of view, briefly illustrate:
If a person is standing about 20 feet from the ground, and while at work slips and loses his equilibrium, and the board just below him, to which he had a right to look for some safety, is weak and gives way in his downward course, he has good cause to complain. Of course, the board must be sufficiently near the point of departure in the fall to make it evident enough that, if it had been in good condition, there would have been no fall.
Mr. Black, in his work entitled “Law and Practice in Accident Oases,” 'citing a list of authorities in a note supporting his text, says that it is a well-settled principle, when two causes contribute to an injury, concur *1107 ring to produce the result, for one of which the defendant is liable and not for the other, the latter cannot escape liability.
Still adhering to the foregoing view, we take it that these boards on the platform were placed there for the sake of some safety to the workman, and that it was reasonable for him to assume that here and there on this platform, if he should meet with an accident, there would be a board upon which to catch and hold himself and avoid a fall.
The foregoing is pertinent as relates to-plaintiff’s written statement in question, and is considered from the point of view that, aside from inconsistency, it is not prejudicial, to his cause.
A rough outline of the ramp is annexed.
Eor reasons assigned, it is therefore ordered, adjudged, and decreed that the judgment appealed from is affirmed.